L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Frederick J. Klorczyk III (State Bar No. 320783)
**BURSOR & FISHER, P.A.**
1990 North California Boulevard, Suite 940
Walnut Creek, California 94596
Tel: (925) 300-4455
ltfisher@bursor.com
jsmith@bursor.com
fklorczyk@bursor.com

W. Daniel "Dee" Miles, III
H. Clay Barnett, III
**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Tel: (334) 269-2343
dee.miles@beasleyallen.com
clay.barnett@beasleyallen.com

Adam J. Levitt*
John E. Tangren*
Daniel R. Ferri*
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com

Benjamin L. Bailey
Jonathan D. Boggs
Michael L. Murphy
**BAILEY GLASSER LLP**
209 Capitol Street
Charleston, West Virginia 25301
Tel: (304) 345-6555
bbailey@baileyglasser.com
jboggs@baileyglasser.com
mmurphy@baileyglasser.com

*Motions to appear *pro hac vice* to be filed

Attorneys for Plaintiffs (*additional counsel appear on signature page*)

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT GARNEAU, COURTNEY JOHNSON, RHONDA PERRY, DAVID TURNER, JANE REEVES, SCOTT REEVES, LISA HENDRICKSON, NANCY HOUSELL, JEFFREY OLKOWSKI, and VAUGHN KERKORIAN, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NISSAN NORTH AMERICA, INC. and NISSAN MOTOR CO., LTD., <br><br> Defendants. | Case Nos. 4:18-cv-07292-HSG <br> 4:18-cv-07815-HSG <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Robert Garneau, Courtney Johnson, Rhonda Perry, David Turner, Jane Reeves, Scott Reeves, Lisa Hendrickson, Nancy Housell, Jeffrey Olkowski, and Vaughn Kerkorian ("Plaintiffs") bring this class action against Nissan North America, Inc. ("NNA") and Nissan Motor Co., Ltd. ("NMC") (together, "Nissan" or "Defendants"), individually and on behalf of the below-defined nationwide and statewide classes they respectively seek to represent (collectively, the "Class") consisting of all persons who purchased, own, owned, lease, or leased a 2015 or newer Nissan or Infiniti vehicle equipped with Forward Emergency Braking or Automatic Emergency Braking system (collectively, the "FEB system"), including but not limited to the Nissan Rogue, Nissan Rogue Sport, Nissan Murano, Nissan Altima, Nissan Maxima, Nissan Armada, Nissan Pathfinder, Nissan Leaf, Nissan Sentra, Infiniti QX30, Infiniti Q50, Infiniti Q60, Infiniti Q70, and Infiniti QX80, (the "Class Vehicles") that were designed, manufactured, distributed, marketed, sold, and/or leased by Nissan.  The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel:

## NATURE OF THE ACTION

1.      This is a class action concerning a defect in the Forward Emergency Braking system featured in every Class Vehicle.  "[T]his intelligent feature uses radar technology to monitor a vehicle's proximity to the vehicle ahead, giving the driver audible and visual display warnings to help the driver reduce the vehicle's speed if a potential frontal collision is detected.  If the driver fails to respond, the [Forward Emergency Braking] system can apply the brakes, helping the driver to avoid the collision or reduce the speed of impact if it is unavoidable."[1]

2.      However, Defendants wrongfully and intentionally concealed one or more defects in the Class Vehicles' front distance sensor, an integral component of the vehicles' FEB systems (the "FEB Defect").  The FEB Defect can cause the FEB system to falsely engage.  The FEB Defect can cause the Class Vehicles to detect non-existent obstacles, thereby automatically

---

[1] https://www.nissanusa.com/experience-nissan/news-and-events/car-safety-features-technology.html (last visited March 22, 2019).

triggering the brakes and causing the Class Vehicles to abruptly slow down or come to a complete stop in the middle of traffic.  In addition to the false engagements, the FEB Defect also causes the FEB system to deactivate itself, rending the feature unavailable to the vehicle's operator.  In such instances, a warning flashes on the dashboard which reads:  "Front radar unavailable due to obstruction."  In either scenario, the FEB system is not a safety feature, but rather an unpredictable safety hazard.

3.      The FEB Defect can cause the Class Vehicles to stop without warning during vehicle operation, thereby posing an unreasonable safety hazard to drivers, passengers, other motorists, and pedestrians.  Many Class Vehicle owners have reported significant, unexpected slow-downs and stops due to the false engagement of the Class Vehicle's FEB system, even though no objects – vehicles, pedestrians, or otherwise – were nearby.  Class Vehicle owners have further complained that the FEB system also frequently deactivates itself, rendering this safety feature useless.

4.      The Class Vehicles are marketed as safe for use.  However, defendants failed to disclose the FEB Defect to consumers, despite their knowledge that the Class Vehicles were defective and not fit for their intended purpose of providing consumers with safe and reliable transportation at the time of the sale and thereafter.  Defendants have actively concealed the true nature and extent of the FEB Defect from Plaintiffs and the other Class members and have failed to disclose it to them at the time of purchase or lease or thereafter.  Had Plaintiffs and the other Class members known about the FEB Defect, they would not have purchased and/or leased the Class Vehicles or would have paid less for them.  As a result of their reliance on Defendants' omissions and/or misrepresentations, Plaintiffs and the other Class members have suffered an ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

5.      Despite notice of the FEB Defect from, among other things, pre-production testing, numerous consumer complaints, warranty data, and dealership repair orders, Defendants have not recalled the Class Vehicles to repair the FEB Defect, have not offered Plaintiffs and the other Class members a suitable repair or replacement free of charge, and have not offered to

reimburse Plaintiffs and the other Class members the costs they incurred relating to diagnosing and repairing the FEB Defect or for the value consumers paid for the FEB feature in the first place. Defendants have refused to repair or replace the Class Vehicles despite the fact that the Class Vehicles are under a comprehensive warranty, as explained in detail below.  Thus, Defendants have wrongfully and intentionally transferred the cost of repair of the FEB Defect to Plaintiffs and the other members of the Classes by fraudulently concealing the existence of the FEB Defect.

6.     Under warranties provided to Plaintiffs and the other members of the Classes, Defendants promised to repair or replace defective FEB components arising out of defects in materials and/or workmanship, such as the FEB Defect, at no cost to owners or lessors of the Class Vehicles.  For illustrative purposes, NNA offers a 36-month or 36,000-mile Basic Warranty that "covers any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan."[2]

7.     Defendants breached their express and implied warranties through which they promised to, *inter alia*, (1) provide Class Vehicles fit for the ordinary purpose for which they were sold; and (2) repair and correct manufacturing defects or defects in materials or workmanship of any parts they supplied, including in the FEB System.  Because the FEB Defect was present at the time of sale or lease of the Class Vehicles, Defendants are required to repair or replace the Class Vehicles pursuant to the terms of the warranty.  Instead, Nissan has wrongfully shifted the cost of repairing the FEB Defect, or replacing the vehicle, to Plaintiffs and the other Class members. These costs are significant, and no reasonable consumer expects to incur such costs.

8.     Knowledge and information regarding the FEB Defect is in the exclusive and superior possession of Defendants and their network of authorized dealers.  Despite this, Defendants have failed to notify Plaintiffs and the other Class members of the FEB Defect, who could not have reasonably discovered the defect through due diligence.  Similarly, Nissan has

---

[2] https://owners.nissanusa.com/content/techpub/common/2016/2016-nissan-warranty-booklet.pdf (last visited Feb. 27, 2019).

failed to provide Plaintiffs and the other Class members with any fix or remedy for the FEB

Defect, despite voluminous customer complaints.

9.        Defendants misrepresented the standard, quality, and/or grade of the Class

Vehicles and knowingly, actively, and affirmatively concealed the existence of the FEB Defect to

increase profits and decrease costs by selling additional Class Vehicles and transferring the cost of

the repair of the FEB Defect, or replacement of the vehicle, to Plaintiffs and the other Class

members.

10.        Defendants knowingly omitted, concealed and suppressed material facts regarding

the FEB Defect, and misrepresented the standard, quality or grade of the Class Vehicles, which

directly caused harm to Plaintiffs and the other members of the Classes.  As a direct result of

Defendants' wrongful conduct, Plaintiffs and the other members of the Classes have suffered

damages, including, *inter alia*: (1) out-of-pocket expenses for repair of the FEB Defect; (2) costs

for future repairs or replacements; (3) sale of their vehicle at a loss; (4) diminished value of their

vehicles; and/or (5) the price premium attributable to the FEB feature.

11.        Plaintiffs and the other Class members therefore assert claims against Defendants

for fraud, breach of express and implied warranties, violation of the Magnuson-Moss Warranty

Act, 15 U.S.C. § 2301, *et seq.*, violation of the California Consumers Legal Remedies Act,

California Civil Code § 1750, *et. seq.* ("CLRA"), violation of the Unfair Competition Law,

California Business & Professions Code § 17200, and unjust enrichment.  Plaintiffs Hendrickson,

Housell, Johnson, Perry, Olkowsi, Reeves, and Turner also assert claims under the statutory

deceptive trade practices laws of their respective states.  As alleged herein, Defendants' wrongful

conduct has harmed owners and lessors of the Class Vehicles, and Plaintiffs and the other

members of the Classes are entitled to damages and injunctive and declaratory relief.

## JURISDICTION AND VENUE

12.        This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal

question).  This Court has jurisdiction over supplemental state law claims pursuant to 28 U.S.C.

§ 1367.

13.     This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA").  28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 members of the Classes, members of the Classes (as defined below) are citizens of states different from Defendants, and greater than two-thirds of the members of the Classes reside in states other than the states in which Defendants are citizens.

14.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(d) with respect to NNA because Plaintiff Garneau resides in this District, a substantial part of the events or omissions giving rise to the claim occurred in this District, and NNA is subject to personal jurisdiction in this District as a California corporation.  Venue properly lies in this District pursuant to 28 U.S.C. § 1391(c)(3) with respect to NMC because, as a non-resident of the United States, NMC "may be sued in any judicial district."

15.     Nissan has maintained research facilities in Silicon Valley since at least 2011 when "engineers from Nissan and its corporate strategic partner Renault opened an office in Mountain View."[3]  In February 2013, Nissan "expanded its presence in Silicon Valley with the opening of [the Nissan Research Center Silicon Valley (NRC-SV),] a new advanced research center initially specializing in autonomous driving and connected cars."  As Nissan's 2013 Annual Report reveals:[4]

---

[3] https://nissannews.com/en-US/nissan/usa/releases/renault-nissan-alliance-opens-bigger-silicon-valley-research-center-to-enhance-advanced-research-and-development (last visited Feb. 27, 2019).

[4] https://www.nissan-global.com/EN/DOCUMENT/PDF/AR/2013/AR2013_E_All.pdf (last visited Feb. 27, 2019).







16.     Nissan introduced Forward Emergency Braking as an option for the 2015 model year after "work[ing] with Bosch to create the predictive forward collision system as part of ACC/ICC."[5]

17.     When Nissan announced in 2017 that it was making Forward Emergency Braking standard for the 2018 model year, it also announced that "Robert Bosch and Continental AG will move into high volume production this year to supply Nissan Motor Co. with advanced automated braking systems across most of its U.S. product line."[6]  All of the sensors Nissan used

---

[5] https://www.extremetech.com/extreme/195593-2015-nissan-murano-review-heavy-on-tech-blurring-the-line-between-mainstream-and-luxury (last visited Feb. 27, 2019).

[6] https://www.autonews.com/article/20170802/OEM10/170809999/nissan-counts-on-bosch-continental (last visited Feb. 26, 2019).

in the Class Vehicles were researched, designed, manufactured, and/or supplied by Bosch and Continental from Silicon Valley.

18.     "Bosch has been present for nearly 20 years in Silicon Valley to lay the foundation for technology advancements that have brought great benefit to the global market and to humankind."[7]  "Bosch's research in Palo Alto, CA … centers on fusing together the capabilities of short-range radar, long-range radar, video cameras, Lidar and other sensors to establish 360-degree visibility around a moving vehicle."[8]

19.     Continental AG similarly maintains its Silicon Valley Research and Development Center in San Jose, CA where "the company currently develops and produces integrated active and passive driving safety technologies and products, such as sensors and advanced driver assistance systems which are essential for the company's automated driving innovations."[9]

20.     In July 2017, Nissan announced its new ProPILOT Assist technology, a "consumer-focused foundation for fully autonomous vehicles of the future."[10]  Like Nissan's Forward Emergency Braking system, "ProPILOT Assist uses a forward-facing camera, forward-facing radar, sensors and electronic control module" to function.  As Nissan details in an article titled "People behind the ProPILOT: From NASA Mission Control to the driver's seat, scientist shapes future of autonomous driving," ProPILOT was developed by Maarten Sierhuis and his team at Nissan's Silicon Valley research center.

---

[7] https://us.bosch-press.com/pressportal/us/en/press-release-2496.html (last visited March 22, 2019).

[8] https://www.wardsauto.com/blog/bosch-embracing-automated-vehicles (last visited Feb. 27, 2019).

[9] https://www.prnewswire.com/news-releases/continental-puts-the-future-in-motion-with-new-research-and-development-center-in-silicon-valley-300438806.html (last visited Feb. 27, 2019)

[10] https://nissannews.com/en-US/nissan/usa/channels/us-nissan-technologies-autonomous-driving/releases/nissan-propilot-assist-technology-reduces-the-hassle-of-stop-and-go-highway-driving-ready-for-u-s-launch (last visited Feb. 27, 2019).

21.      According to Defendants, "[t]he opening of NRC-SV is part of Nissan's global strategy to expand and localize its R&D function in strategic markets.  The new Silicon Valley research center will take responsibility for selected roles in collaboration with Nissan Research Center in Japan.[11]

## PARTIES

### Plaintiffs

22.      Plaintiff Robert Garneau is a citizen of California and resides in San Jose, California.  Mr. Garneau owns a 2018 Nissan Murano SL, which he purchased in or around Fall of 2018 from a Nissan-authorized dealer, Premier Nissan of Stevens Creek of Santa Clara, California, for his personal or household use.  After his purchase, Mr. Garneau experienced the FEB Defect.

23.      Plaintiff Courtney Johnson is a citizen of Florida and resides in Jacksonville, Florida.  Ms. Johnson owns a 2018 Nissan Rogue Sport, which she purchased on September 21, 2018 from a Nissan-authorized dealer, Nissan of Jacksonville of Jacksonville, Florida, for her personal or household use.

24.      On or about February 8, 2019, Ms. Johnson's Rogue stopped suddenly while driving on a surface street due to the FEB Defect.  Though no vehicles or obstacles were in front of her, the brakes on her Rogue Sport automatically engaged, bringing the vehicle to a complete stop in the middle of the street.  Nissan of Jacksonville attempted to remedy the condition, but, on March 12, 2019, Ms. Johnson's Rogue Sport again stopped suddenly, with the brakes automatically engaging with no obstacles or vehicles in front of her.

25.      Plaintiff Rhonda Perry is a citizen of Florida and resides in Alachua, Florida.  Ms. Perry owns a 2018 Nissan Murano Platinum AWD, which she purchased on February 12, 2019 from HGreg.com for her personal or household use.

---

[11] https://www.prnewswire.com/news-releases/renault-nissan-alliance-opens-bigger-silicon-valley-research-center-to-enhance-advanced-research-and-development-191703181.html (last visited Feb. 28, 2019).

26.    On approximately twenty occasions, without any noticeable obstructions, the "front radar unavailable due to obstruction" light has illuminated on Ms. Perry's Murano.

27.    Plaintiff David Turner is a citizen of Massachusetts and resides in Attleboro, Massachusetts.  Mr. Turner owns a 2017 Nissan Rogue Sport, which he purchased new in 2018 from a Nissan-authorized dealer in Massachusetts, for his personal or household use.

28.    Within weeks after his purchasing the vehicle, Mr. Turner's 2017 Rogue began stopping suddenly due to the FEB Defect.  Mr. Turner's 2017 Rogue has most commonly stopped suddenly in parking garages, where his brakes lock up, suddenly and forcefully, as he approaches an up ramp.

29.    Mr. Turner has made his Nissan dealer aware of the FEB Defect but has not been provided any effective remedy.

30.    Plaintiffs Scott and Jane Reeves are citizens of Missouri and reside in St. Ann, Missouri.  The Reeves own a 2017 Nissan Rogue SL AWD, which they purchased on January 11, 2019 from a Nissan-authorized dealership, Napleton St. Louis Nissan of St. Louis, Missouri, for their personal or household use.

31.    The Reeves' Rogue SL AWD has stopped suddenly due to the FEB Defect.  While driving, and with no vehicles or obstacles in front of them, the Reeves' Rogue SL's brakes automatically engaged, which brought the vehicle to a complete stop in the road.

32.    Plaintiff Lisa Hendrickson is a citizen of New York and resides in Hornell, New York.  Ms. Hendrickson owns a Nissan Rogue SV, which she purchased on January 4, 2019 from Simmons Rockwell Dealership of Hornell, New York for her personal or household use.

33.    While driving, and with no vehicles or obstacles in front of her, the brakes on Ms. Hendrickson's Rogue SV have automatically engaged, causing her to have to pull over to the shoulder.

34.    Plaintiff Nancy Housell is a citizen of New York and resides in Middletown, New York.  Plaintiff Housell leased a 2018 Nissan Rogue in or around October of 2018 from a Nissan-authorized dealer, Thruway Nissan of Newburgh, New York, for her personal or household use.

Prior to purchase, Plaintiff Housell reviewed Nissan's promotional materials regarding the vehicle and interacted with at least one sales representative at Thruway Nissan.

35. Nissan failed to disclose the FEB Defect to Ms. Housell before she leased her Rogue, despite Nissan's knowledge of the defect, and Ms. Housell, therefore, leased her Rogue with the incorrect understanding that it would be a safe and reliable vehicle. Had Ms. Housell known about the FEB Defect, she would not have leased her Rogue, or certainly would not have paid as much for it as she did.

36. Plaintiff Jeff Olkowski is a citizen of the State of Pennsylvania and resides in McMurray, Pennsylvania. In or around November of 2018, Plaintiff Olkowski purchased a 2018 Nissan Rogue from a Nissan-authorized dealer, John Sisson Nissan of Washington, PA, for his personal or household use. Prior to purchase, Plaintiff Olkowski reviewed Nissan's promotional materials regarding the vehicle and interacted with at least one sales representative at Josh Sisson Nissan.

37. Two days after purchasing his Rogue, Mr. Olkowski was traveling between Pittsburgh and Indianapolis along Interstate 70 when he started receiving messages on the dashboard which read "Unavailable Front Radar Obstruction." Shortly thereafter, despite the fact that no vehicles or obstacles were in front of him, the brakes on his 2018 Rogue automatically applied, and his vehicle was brought to a complete stop in the middle of the highway. Other drivers behind him on Interstate 70 were forced to swerve around his stopped vehicle.

38. Nissan failed to disclose the FEB Defect to Mr. Olkowski before he purchased his Rogue, despite Nissan's knowledge of the defect, and Mr. Olkowski, therefore, purchased his Rogue with the incorrect understanding that it would be a safe and reliable vehicle. Had Mr. Olkowski known about the FEB Defect, he would not have purchased his Rogue, or certainly would not have paid as much for it as he did.

39. Plaintiff Vaughn Kerkorian is a citizen of Texas and resides in Plano, Texas. Mr. Kerkorian owns a 2018 Nissan Rogue, and was the previous owner of a 2017 Nissan Rogue,

which he purchased in July 2017 from a Nissan-authorized dealer, Crest Nissan of Frisco, Texas, for his personal or household use.

40.     In November 2017, Mr. Kerkorian's 2017 Rogue first stopped suddenly due to the FEB Defect.  Just as he approached a set of electric train tracks in downtown Plano, Texas, the brakes on his 2017 Rogue automatically applied, and his vehicle was brought to a complete stop in the middle of the train tracks, with the engine shut off.

41.     In December 2017, Mr. Kerkorian's 2017 Rogue again stopped suddenly due to the FEB Defect, at the same electric train tracks in downtown Plano, Texas.  Once again, his vehicle was brought to a complete stop in the middle of the tracks, with the engine shut off.

42.     After speaking with a representative at the Crest Nissan dealership where he purchased his 2017 Rogue regarding these extremely dangerous situations, the representative informed Mr. Kerkorian that it had spoken with Nissan corporate and Nissan was aware of the FEB Defect.

43.     To address Mr. Kerkorian's problem, Nissan offered to swap Mr. Kerkorian's 2017 Rogue for a 2018 Rogue that also had AEB technology.  Mr. Kerkorian would also have to pay a $1,900 usage tax.  Mr. Kerkorian accepted this purported solution.  Had Mr. Kerkorian known that the FEB Defect would also be present in his 2018 Rogue, he would not have accepted the 2018 Rogue.

44.     Mr. Kerkorian received his 2018 Rogue at Crest Nissan in July 2018.  In October 2018, Mr. Kerkorian's 2018 Rogue stopped suddenly due to the FEB Defect at the same electric train tracks in downtown Plano, Texas.  Nissan has since refused to provide any remedy for the FEB Defect in Mr. Kerkorian's 2018 Rogue.

45.     When Plaintiffs and the other Class members purchased or leased their Class Vehicles, they reasonably relied on the expectation that the Class Vehicles were free from defects such as the FEB Defect and/or would not pose an unavoidable safety risk.  Had Defendants disclosed the FEB Defect, Plaintiffs and the other Class members would not have purchased or leased the Class Vehicles or would have paid less for their vehicles.

46.     The Class Vehicles were operated in a reasonably foreseeable manner and as the vehicles were intended to be used.  Plaintiffs and the other Class members have suffered an ascertainable loss as a result of Defendants' deceptive conduct, breach of warranty, common law and statutory duties, and omissions and/or misrepresentations associated with the FEB Defect, including but not limited to, out-of-pocket losses and/or the costs of future repairs or replacements, the price premium attributable to the FEB feature, and diminished performance and value of their respective vehicles.

47.     Neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiffs and the other Class members of the FEB Defect prior to the purchase or lease of the Class Vehicles, nor at any time thereafter.

**Defendants**

48.     Defendant NNA is a California corporation with its principal place of business located at 983 Nissan Drive, Smyrna, TN 37167.  NNA does business throughout the United States.  NNA engages in business, including the design, manufacturing, advertising, marketing, and sale of Nissan and Infiniti automobiles nationwide, including throughout New York and California.

49.     Defendant NMC is a Japanese corporation headquartered in Yokohama, Japan. NMC is the parent corporation of NNA.  NMC, through its various agents and subsidiaries – including NNA – designs, manufactures, markets, distributes and sells Nissan and Infiniti automobiles in California and multiple other locations in the United States.

50.     NNA and NMC sell Nissan and Infiniti vehicles through a network of dealerships that are the agents of NNA and NMC.  In 2017, Nissan sold 1,440,049 cars nationwide.[12] Approximately 10% (or 143,815) of those sales occurred in California.[13]

---

[12] https://nissannews.com/en-US/nissan/usa/releases/nissan-group-reports-december-and-2017-calendar-year-u-s-sales (last visited Feb. 27, 2019).

[13] https://www.cncda.org/wp-content/uploads/California-Covering-1Q-2018.pdf (last visited Feb. 27, 2019).

51.     There exists, and at all times herein existed, a unity of ownership between NMC, NNA and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.  Upon information and belief, at all times mentioned herein, each Defendant was acting as an agent and/or employee of the other Defendant, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of the other Defendant.  In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, the other Defendant.

52.     Upon information and belief, Defendant NMC communicates with Defendant NNA concerning virtually all aspects of the Nissan and Infiniti vehicles it distributes within the United States.  At all relevant times, NNA acted as an authorized agent, representative, servant, employee and/or alter ego of NMC while performing activities including but not limited to advertising, warranties, warranty repairs, dissemination of technical information and monitoring the performance of Nissan and Infiniti vehicles in the United States, including substantial activities that occurred within this jurisdiction.

53.     At all times relevant to this action, Defendants manufactured, distributed, sold, leased, and warranted the Class Vehicles under the Nissan and Infiniti brand names throughout the United States.  Defendants and/or their agents designed and manufactured the Class Vehicles. Defendants and/or their agents also developed and disseminated the owner's manuals and warranty booklets and information, advertisements, and other promotional materials relating to the Class Vehicles.

**FACTS COMMON TO ALL CAUSES OF ACTION**

**A.      The Forward Emergency Braking ("FEB") System Defect**

54.     In 2015, Nissan and Infiniti began offering the feature known as "Forward Emergency Braking" ("FEB") as on option on the Class Vehicles.  For example, FEB was available as a part of the $2,020 "SL Premium Package" option on the 2017 Nissan Rogue SL.

55.     Starting in 2018, Nissan began offering "Automatic Emergency Braking" ("AEB") feature, formally known as Forward Emergency Braking, as part of its newly-introduced Intelligent Safety Shield ("ISS").  ISS is Nissan's "way of looking out for you and yours by monitoring, responding and protecting to help keep you and your passengers safe."  ISS is an umbrella term for several technologies meant to assist drivers and boost safety, including the FEB system.  ISS and FEB are standard on many 2018 Nissan models, including the Nissan Rogue/Rogue Sport, Nissan Altima, Nissan Murano, Nissan Leaf, Nissan Pathfinder, Nissan Maxima, and Nissan Sentra.[14]  Nissan expected to sell roughly 1,000,000 of these vehicles in 2018 alone.[15]  Infiniti vehicles use a substantially similar – if not identical – system.[16]

56.     FEB "provide[s] audible and visual alerts and apply braking to help you avoid or mitigate a frontal collision with a vehicle ahead."  FEB relies on a front distance sensor in the front grille to monitor a car's proximity to the vehicle ahead, warn of possible collisions, and hit the brakes if the driver cannot.

57.     But a problem with the sensor modules in the Class Vehicles causes the FEB system to frequently deactivate itself and/or to falsely engage FEB, thereby causing the Class Vehicles to unexpectedly and abruptly slow down and/or come to a stop despite no obstacles being nearby (the "FEB Defect").  The FEB Defect presents a safety hazard that renders the Class Vehicles unreasonably dangerous to consumers because it severely impacts a driver's ability to control vehicle speed as expected under normal driving conditions and maintain an appropriate speed based on traffic flow, thereby increasing the risk of a rear-end collision.

58.     As Digital Trends detailed in September 2018:

---

[14] https://nissannews.com/en-US/nissan/usa/releases/nissan-to-offer-standard-automatic-emergency-braking-aeb-on-one-million-u-s-vehicles-in-2018-model-year?query=automatic+emergency+braking (last visited Feb. 27, 2019).

[15] https://www.nissanusa.com/experience-nissan/news-and-events/car-safety-features-technology.html (last visited Feb. 27, 2019).

[16] https://www.infinitiusa.com/infiniti-now/technology/forward-emergency-braking.html (last visited Feb. 27, 2019).

After Digital Trends identified the issue in the 2018 Nissan Sentra and brought it to the automaker's attention, the company acknowledged the problem, and said it was working to replace the faulty part.

"Nissan is aware of a relatively limited population of Sentra customers who are reporting conditions similar to that which you described," Dan Bedore, Director of Communications for Nissan, told Digital Trends.  "Our engineering team has identified the cause to be a supplied-component issue…  Nissan is well into the standard process for obtaining counter-measure parts and informing our dealers of the remedy, which is expected in the coming weeks."

A Bosch spokesman told Digital Trends that it was helping Nissan with the issue, but declined to specify which other automakers use the module, or who make the radar chips within them.

"We hope you will appreciate that, as a matter of principle, we do not comment on actions of our customers.  We are working closely with Nissan to support it in the measures it has taken.  We hope you will understand that only the automaker is in a position to answer questions in detail," the company said.[17]

**B.    Nissan's Knowledge of the FEB Defect**

59.    Nissan became aware of the FEB Defect through sources not available to Plaintiffs and the other members of the Classes, including, but not limited to:  pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Nissan's network of dealers and directly to Nissan, aggregate warranty data compiled from Nissan's network of dealers, testing conducted by Nissan in response to consumer complaints, and repair order and parts data received by Nissan from Nissan's network of dealers and suppliers, including Bosch and Continental.

60.    Nissan had and continues to have a duty to fully disclose the true nature of the FEB Defect to Class Vehicle owners, among other reasons, because the FEB Defect poses an unreasonable safety hazard; because Nissan had and has exclusive knowledge or access to material facts about the Class Vehicles' FEB systems that were and are not known to or

[17] https://www.digitaltrends.com/cars/faulty-radars-compromising-nissan-emergency-braking-system/ (last visited Feb. 27, 2019).

reasonably discoverable by Plaintiffs and the other members of the Classes; and because Nissan has actively concealed the FEB Defect from its customers at the time of purchase or repair and thereafter.

61.     Specifically, Defendants: (a) failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the FEB Defect; (b) failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles and their FEB systems were not in good working order, were defective and prone to failure, and were not fit for their intended purpose; and (c) failed to disclose and/or actively concealed the fact that the Class Vehicles and their FEB systems were defective, despite the fact that Defendant learned of the FEB Defect before it placed the Class Vehicles in the stream of commerce.

62.     Nissan has been aware of problems with the FEB feature since at least 2015, given its release of a series of Technical Service Bulletins ("TSBs") to dealers related to the radar sensor used in the Class Vehicles' FEB systems starting in 2016.  "Manufacturers typically issue more TSBs in the first model year of a new or redesigned vehicle when, despite extensive pre-production testing, they discover design, engineering and manufacturing flaws after the vehicles are exposed to the ultimate test – being driven in the real world."[18]  As detailed further below, in 2015, Class members began complaining about the FEB Defect in model year 2015 Nissan Muranos – the first Class Vehicle to offer the option.[19]  *See infra* ¶¶ 47-61.

63.     On September 6, 2016, Nissan released Technical Service Bulletin NTB15-099b concerning the radar sensor used in the Intelligent Cruise Control ("ICC") and FEB systems in the Class Vehicles.[20]  The TSB was designed to remedy two Diagnostic Trouble Codes ("DTCs")

---

[18] *See* https://www.chicagotribune.com/classified/automotive/chi-recall-tsb-or-customer-service-campaign-whats-the-difference-story.html (last visited Feb. 27, 2019).

[19] *See* https://www.youtube.com/watch?v=J-qiiVMReLw (last visited Feb. 27, 2019).

[20] https://static.nhtsa.gov/odi/tsbs/2016/SB-10091586-2280.pdf (last visited Feb. 27, 2019).

– DTC C1A16 (RADAR BLOCKED) and DTC C1A12 (LASER BEAM OFFCNTR) and applied to the following Nissan vehicles:  2016 Altimas, 2016 Maximas, 2015-2016 Muranos, 2016 Murano Hybrids, 2015-2016 Rogues, and 2016 Sentras.

64.     On November 28, 2016, Nissan released TSB NTB16-116 that noted a potential impact on FEB.[21]

65.     On August 1, 2017, Nissan issued TSB PC499 mandating a "quality assurance hold" related to the "front camera."

66.     On February 1, 2018, Nissan released TSB NTB18-008 which "applie[d] only to vehicles equipped with Automatic Emergency Braking (AEB) or Forward Emergency Braking (FEB)."

67.     On June 8, 2018, Nissan released TSB NTB18-041 concerning the "Unexpected Operation of AEB, FEB OR FCW [Forward Collision Warning]" in 2018 Rogue, Rogue Hybrid, and Rogue Sport vehicles.  The TSB stated that "The following system(s) operate unexpectedly or the customer reports unexpected operation:  AEB (Automatic Emergency Braking); FEB (Forward Emergency Braking); FCW (Forward Collision Warning).  On July 19, 2018, Nissan released an amended TSB NTB18-041a, updated to include 2017-18 Rogue, Rogue Hybrid, and Rogue Sport vehicles.

68.     On August 17, 2018, Nissan released TSB PC637 informing dealers it was "conducting a quality action to reprogram the Laser Radar and Advanced Drive Assist System (ADAS) software the on specific MY2018 Rogue (T32) vehicles built in the Smyrna, TN manufacturing plant.  These vehicles are either currently in dealer inventory or assigned and in transit to the dealer.  The software update is designed to help improve the performance of Automatic Emergency Braking (AEB), Forward Emergency Braking (FEB), and Forward Collision Warning (FCW) systems in the affected vehicles."

---

[21] https://www.nhtsa.gov/vehicle/2016/NISSAN/ROGUE/SUV/AWD#manufacturerCommunications (last visited Feb. 27, 2019).

69.     On January 25, 2019, issued after this matter was commenced, Nissan released NPSB18-443 AEB U – "Automatic Emergency Braking (AEB) Update Notification Letter" – related to the 2017-2018 Nissan Rogue and Rogue Sport. In this bulletin, Nissan stated "[i]n rare instances and unique roadway environments such as certain types of railroad crossings and metal overpasses, the AEB system in some vehicles may activate braking when not needed."

70.     As the Center for Auto Safety ("CAS") just explained on March 21, 2019, this "'Customer Service Initiative' intended to 'increase awareness of an available update for the Automatic Emergency Braking (AEB) system.'  Presumably, this update is the repair outlined in the July 2018 TSB. …  [However,] the summary portion available suggests that <u>Nissan's communication to Rogue owners does not acknowledge the potential safety issue involved.  The language treats the problem as no more than a performance update, thus providing little incentive for consumers to avail themselves of the repair opportunity until they experience the problem.</u>" [22]

71.     But it gets even worse.  As CAS details, "the repair described in the Nissan 'Customer Service Initiative' is available to owners at no cost only during the basic coverage period of the warranty, 3 years or 36,000 miles.  This means that within the next year, some owners of defective Rogue AEB systems will begin being forced to pay for repairs that should have been provided under a recall at no cost and for a substantially longer period than the basic warranty." [23]

72.     Nissan also has constantly tracked the National Highway Traffic Safety Administration ("NHTSA") database to track reports of defective FEB systems.  From this source, Nissan knew that the Class Vehicles were experiencing unusually high levels of false engagements causing abrupt slow-downs or stops; or deactivations.

---

[22] https://www.autosafety.org/wp-content/uploads/2019/03/Center-for-Auto-Safety-Nissan-Rogue-AEB-Defect-Petition-FINAL.pdf (last visited Mar. 22, 2019).  On March 21, 2019, CAS submitted a petition to NHTSA to "initiate a Defect Investigation into false activation of the emergency braking system that is placing Rogue owners and other road users in danger."  *Id.*

[23] https://www.autosafety.org/wp-content/uploads/2019/03/Center-for-Auto-Safety-Nissan-Rogue-AEB-Defect-Petition-FINAL.pdf (last visited Mar. 22, 2019).

73.     As CAS explains, it "found 87 such complaints in NHTSA's VOQ data for the 2017-18 Rogue.  All of these complaints indicate that the Rogue's AEB engaged when no obstruction was in the path of the vehicle.  Many complaints indicate that braking is abrupt or forceful, endangering both the Rogue occupants as well as people in vehicles nearby, who are forced to avoid a collision with a suddenly stopped vehicle."[24]

74.     The following example complaints filed by consumers with NHTSA and posted on the Internet demonstrate that the FEB Defect is a widespread safety hazard that continues to plague the Class Vehicles.  Consumer complaints began with the 2015 Nissan Murano:

- **November 4, 2016 – Winnetka, IL – Forward Collision Avoidance**
  THE FORWARD EMERGENCY BRAKING SYSTEM WARNING LIGHT COMES ON (THIS MEANS THE SENSOR IS NOT WORKING AND THE EMERGENCY WARNING IS NOT WORKING; FURTHER YOU CANNOT USE CRUISE CONTROL WHEN THE LIGHT IS ON). THIS HAS BEEN A PROBLEM FROM THE BEGINNING OF OWNING THE CAR. THE DEALER TRIED MANY TIMES TO REPAIR THE PROBLEM, ALL UNSUCCESSFUL. NEXT THE DEALER REPLACED THE SENSOR, AND THE PROBLEM STILL EXISTS. THE WARNING LIGHT COMES ON WHEN THE VEHICLE HAS BEEN DRIVEN FOR A FEW MINUTES- 5 TO 30 MINUTES AFTER STARTING.

- **February 27, 2017 – West Hills, CA – Forward Collision Avoidance**
  TL* THE CONTACT OWNS A 2015 NISSAN MURANO. WHILE DRIVING VARIOUS SPEEDS, THE FORWARD BRAKING SYSTEM WARNING INDICATOR ILLUMINATED. THE VEHICLE WAS TAKEN TO THE DEALER FOR ROUTINE MAINTENANCE. THE CONTACT STATED TO THE TECHNICIAN THAT THE FORWARD BRAKING WARNING INDICATOR ILLUMINATED. IT WAS DIAGNOSED THAT THE WARNING INDICATOR WAS ILLUMINATED DUE TO THE VEHICLE BEING BUMPED AND THAT THE EMERGENCY BRAKING SYSTEM WAS TURNED OFF. THE ISSUE PERSISTED. THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC WHERE THE ISSUE COULD NOT BE DIAGNOSED. THE CONTACT MENTIONED THAT THE VEHICLE WAS PREVIOUSLY HIT A MONTH PRIOR. THE CONTACT ALSO STATED THAT THE FRONT DRIVER AND PASSENGER SIDEVIEW MIRRORS "CLOSE VEHICLE" WARNING SIGNALS NO LONGER ILLUMINATED WHEN OTHER VEHICLES WERE CLOSE. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURES. THE FAILURE MILEAGE WAS 12,000.

75.     Complaints for the 2016 Nissan Murano are similar:

---

[24] https://www.autosafety.org/wp-content/uploads/2019/03/Center-for-Auto-Safety-Nissan-Rogue-AEB-Defect-Petition-FINAL.pdf (last visited Mar. 22, 2019).

- **October 27, 2018 – Greensboro, NC – Forward Collision Avoidance**
  ADAPTIVE CRUISE CONTROL AND FORWARD EMERGENCY BRAKING (FEB) SYSTEM BECOMES SPONTANEOUSLY DISABLED DURING DRIVING. THIS POSES A SERIOUS ISSUE WHEN ACTUALLY DRIVING THE CAR. THE CAR IS IN MOTION WHEN THIS HAPPENS. THE SYSTEM CAN ONLY BE RESET BY STOPPING THE CAR, TURNING OFF THE IGNITION AND THEN RE-STARTING THE ENGINE.

76.     Complaints for the 2017 Nissan Murano are similar:

- **August 19, 2018 – Orland Park, IL – Forward Collision Avoidance**
  MY VEHICLE HAD A WARNING LIGHT COME ON STATING "FRONT COLLISION AVOIDANCE UNAVAILABLE". IT WOULD SHUT OFF THE CRUISE CONTROL. TOOK IT INTO THE DEALER. THEY SAID THE VEHICLE OPERATED AS DESIGNED. TOOK IT BACK IN SEVERAL WEEKS LATER DEMANDING THEY FIX THE PROBLEM. TOOK A TEST DRIVE WITH THE TECHNICIAN. PROBLEM DID NOT REOCCUR. I GOT OUT. THE TECHNICIAN STARTED THE CAR TO PULL IT IN THE SHOP AND THE WARNING CAME ON. THEY TRACED THE PROBLEM TO A SENSOR. THE SENSOR IS NOT AVAILABLE AND IS ON BACKORDER. IN THE MEAN TIME THE CRUISE DOES NOT OPERATE AND THE FRONT COLLISION AVOIDANCE DOES NOT WORK (WAITING 5 WEEKS NOW). CANNOT DEPEND UPON THE COLLISION AVOIDANCE EVEN THOUGH THEY ADVERTISE IT.

77.     Complaints for the 2018 Nissan Murano are similar:

**Sep 17, 2018 - Washington, DC - Forward Collision Avoidance**
TL* THE CONTACT OWNS A 2018 NISSAN MURANO. WHILE DRIVING VARIOUS SPEEDS, THE CRUISE CONTROL ENGAGED WITHOUT WARNING. THE CONTACT STATED THAT THE CRUISE CONTROL FEATURE OF THE VEHICLE WAS CONTROLLED BY A COLLISION CONTROL SYSTEM, WHICH MALFUNCTIONED WHILE ON AN INCLINE AND WHILE DRIVING VARIOUS SPEEDS ON A BRIDGE. EACH TIME THE FAILURE OCCURRED, THE VEHICLE DECELERATED WITHOUT ANY WARNING OR BRAKE LIGHTS ILLUMINATED. THE DEALER WAS NOT MADE AWARE OF THE FAILURE. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND PROVIDED THE CONTACT WITH CASE NUMBER: 32755178. THE FAILURE MILEAGE WAS APPROXIMATELY 500.

78.     Complaints for the 2016 Nissan Rogue are similar:

- **July 2, 2018 – Nashville, TN – Forward Collision Avoidance**

  FRONT COLLISION SENSOR GOES OFF AT RANDOM SPEEDS WHILE TRAVELING FORWARD WITH NO ONE ON THE ROAD AHEAD. THE VEHICLE AUTOMATICALLY APPLIES THE BRAKE IN SOME INSTANCES. THE INFOTAINMENT SYSTEM ALSO RESETS ITSELF PERIODICALLY. PRIOR SERVICE HAS HAD THE ENTIRE BODY CONTROL MODULE REPLACED, BUT ELECTRICAL ISSUES PERSIST. MULTIPLE DEALERS HAVE NOT BEEN ABLE TO RECREATE THE PROBLEM EVEN THOUGH ISSUES ARE STILL PRESENT. SIGNIFICANT SAFETY HAZARD BY VEHICLE AUTOMATICALLY APPLYING BRAKE RANDOMLY AND NISSAN STILL DOES NOTHING TO RESOLVE THE ISSUE. THESE INSTANCE HAPPEN ON MULTIPLE OCCASIONS.

79. Complaints for the 2017 Nissan Rogue are similar:

- **Oct 09, 2018 - Villas, NJ - Forward Collision Avoidance**
  TL* THE CONTACT OWNS A 2017 NISSAN ROGUE. WHILE DRIVING APPROXIMATELY 40 MPH AND ATTEMPTING TO STOP THE VEHICLE, THE BRAKE PEDAL TRAVELED TO THE FLOORBOARD WHEN IT WAS DEPRESSED. THE VEHICLE DID NOT STOP AND REAR ENDED THE PRECEDING VEHICLE. THERE WAS NO WARNING INDICATOR ILLUMINATED. THE AIR BAGS DID NOT DEPLOY. A POLICE REPORT WAS FILED. THE CONTACT SUSTAINED INJURIES THAT LATER REQUIRED MEDICAL ATTENTION. THE VEHICLE WAS DAMAGED AND TOWED TO A PRIVATE PROPERTY. THE CONTACT CALLED TEAM NISSAN AT (856) 696-2277 (LOCATED AT 1715 S DELSEA DR, VINELAND, NJ 08360) AND WAS REFERRED TO THE MANUFACTURER. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND ASKED IF THE CONTACT WANTED THE VEHICLE REPAIRED. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 13,000. THE VIN WAS NOT PROVIDED.

- **Mar 01, 2018 - Del Ray Beach, FL - Crash Imminent Braking**
  TL* THE CONTACT OWNS A 2017 NISSAN ROGUE. THE CONTACT STATED THAT THE FORWARD EMERGENCY BRAKING PACKAGE FUNCTION FAILED TO PROVIDE A WARNING AND DID NOT BRAKE WITHOUT THE CONTACT APPLYING FORCE TO THE BRAKE PEDAL. THE DEALER (WEST PALM BEACH NISSAN, 3870 W BLUE HERON BLVD, RIVIERA BEACH, FL 33404, (561) 612-4825) WAS NOTIFIED AND TESTED THE VEHICLE, CONSUMER WAS LATER TOLD THAT TEST WAS UNOFFICIAL AS CORPORATE SAID TOLD THEM THEY COULDN'T TEST FEATURE. DELRAY NISSAN SAID THE SAME FEATURE IN INFINITI QX60 WORK PERFECTLY SO DOES CRUISE CONTROL BRAKING IN BOTH VEHICLES. HOWEVER WITHOUT CRUISE CONTROL ACTIVATED THE NISSAN FORWARD COLLISION SEEMS NOT WORK. THE APPROXIMATE FAILURE MILEAGE WAS 130.

- **Jan 10, 2018 - Mansfield, OH - Forward Collision Avoidance**
  THERE IS A SAFETY ISSUE WITH THE FRONT BRAKING SYSTEM. THERE IS EVEN A DOCUMENT SEND TO THE NISSAN DEALERSHIPS NOTIFYING THEM THAT IT IS A KNOWN ISSUE, BUT THERE IS NO FIX AS OF YET THE ENGINEERS CANNOT EVEN FIND A CAUSE FOR THE ISSUE. I ASKED FOR A COPY OF THE LETTER, BUT, OF COURSE, IT IS A "CONFIDENTIAL" DOCUMENT AND ONLY PRIVILEGED PARTIES ARE ABLE TO HAVE ACCESS TO IT. WHAT HAPPENS IS THERE WILL BE AN AUDIBLE BEEPING (TWO-THREE TIMES) AND IMMEDIATELY AFTER YOUR CAR WILL SLAM ON THE BRAKES ON IT OWN, WHICH IN TURN KICKS ON THE ANTI-LOCK BRAKES. THERE WILL BE NOTHING ON THE SENSOR OR NOTHING IN YOUR PATH IN FRONT OF YOU. IT DOES THIS SPONTANEOUSLY. THIS WAS WHILE I WAS DRIVING!!!! THIS HAS HAPPENED TO ME 3 TIMES ALREADY. WHEN HOOKED UP TO A DIAGNOSTIC TESTER, IT THROWS A CODE THAT THERE WAS SOMETHING IN FRONT OF THE SENSOR. THE DATE MARKED ON THIS CLAIM/REPORT WAS THE LAST TIME IT HAS HAPPENED....SO FAR....

- **Dec 31, 2017 - Vacaville, CA - Forward Collision Avoidance**
  THIS VEHICLE WAS PURCHASED NEW FROM THE DEALERSHIP, NISSAN OF VACAVILLE, ON 9-16-2017. ON 10-26-2017 WHILE TRAVELING AT APPROXIMATELY 35 MPH THE VEHICLE'S FORWARD EMERGENCY BRAKING SYSTEM (FEB) SUDDENLY AND UNEXPECTEDLY ACTIVATED, BRING THE CAR TO A FULL AND COMPLETE STOP IN THE MIDDLE OF THE ROAD. THE BRAKING SYSTEM DISENGAGED WITHIN A FEW SECONDS AND I WAS ABLE TO PULL TO THE SIDE OF THE ROAD. THERE WERE NO ADVERSE CONDITIONS, OBSTRUCTIONS, OR VEHICLES WITHIN A DANGEROUS DISTANCE TO HAVE CAUSED THE ACTIVATION. THE DASHBOARD WARNING LIGHTS DISPLAYED THE ALERT MESSAGE "WARNING" "MALFUNCTION." THE VEHICLE WAS SUBSEQUENTLY TOWED TO AUTOCOM NISSAN OF CONCORD FOR SERVICE AND DIAGNOSIS. I WAS TOLD CODES U1002, C1B5D, AND C1A16-97 WERE STORED IN THE COMPUTER SYSTEM. C1A16-97 RELATES TO AN OBSTRUCTION OR BLOCKED RADAR SENSOR, BUT THAT ALL THE STORED CODES WERE IN THE PAST. C1A16-97 WAS STORED AT 1983 MILES - I EXPERIENCED NO ACTIVATION OF THE SYSTEM AT THAT TIME. ACCORDING TO THE DEALERSHIP THERE WERE NO STORED CODES RELATED TO TODAY'S INCIDENT. NISSAN TECH LINE MADE A REMOTE DIAGNOSIS AND CONCLUDED A LOOSE LICENSE PLATE FRAME LIKELY HAD CAUSED AND OBSTRUCTION, ACTIVATING THE SYSTEM. THIS IS IN CONFLICT WITH THE OWNERS MANUAL'S EXPLANATION OF FEB SHUT DOWN IN THE EVENT OF AN OBSTRUCTION. ON 12-19-2017 I RETURNED THE VEHICLE TO THE DEALERSHIP WHERE I PURCHASED THE CAR. AFTER FOUR DAYS OF DIAGNOSTIC AND ROAD TESTING I WAS TOLD THAT, ACCORDING TO NISSAN TECH LINE, SINCE THE DEALERSHIP WAS UNABLE TO DUPLICATE THE MALFUNCTION DURING THE TEST DRIVE, THEN THE CAR IS CONSIDERED OPERATIONAL AND SAFE AND COULD BE RETURNED TO THE CUSTOMER. AND ALTHOUGH FINDING MULTIPLE PAST CODES STORED ECM-UL00L, ASB-UL002, BCM UL000-00, UL000-01, CLB40-49, CLB30-49, UL000-00, ICC /ADAS-C1B53-04, CLB54-00, UL000-01 ALL INDICATION MALFUNCTION. NONE OF WHICH HAVE BEEN RESOLVED OR REPAIRED. ## VIN PASSED ## NISSAN ROUGE S FWD 2017.5 ##

- **Dec 22, 2017 - Roswell, GA - Forward Collision Avoidance**
  THE FIRST TIME THE VEHICLE MALFUNCTIONED, I WAS DRIVING IN A GROCERY STORE PARKING LOT WITH A PERSONAL FRIEND AND SUDDENLY THE CAR'S EMERGENCY BRAKE PROTECTION ACTIVATED JOLTING THE CAR TO A STOP. THE SECOND OCCURRENCE WAS IN A PARKING DECK (DIFFERENT FROM THE FIRST LOCATION) AND THE CAR AGAIN ACTIVATED THE EMERGENCY BRAKE PROTECTION SYSTEM JOLTING THE CAR TO A STOP. I THEN FELT THIS WAS A SAFETY ISSUE AND BROUGHT THIS INTO THE NISSAN DEALERSHIP. THEY CHECKED THE CAR AND CALLED REPORTING THEY COULD NOT FIND ANYTHING WRONG WITH THE CAR AND I SHOULD PICK IT UP. I PICKED THE CAR UP AND CONTINUED TO DRIVE IT UNTIL I SWITCHED CARS WITH A PERSONAL FRIEND WHO USED THE CAR TO DRIVE

ONE MILE BACK TO HOME DOWN A 4 LANE ROAD. UPON COMING TO AN
INTERSECTION, SHE REPORTS SHE BEGAN SLOWING DOWN AND GOT IN A
TURN LANE TO MAKE A LEFT ONTO OUR NEIGHBORHOOD ROAD AND AS
SHE WAS APPROACHING THE LIGHT, THE CAR ACTIVATED THE EMERGENCY
BRAKING SYSTEM, AGAIN JOLTING THE CAR TO A STOP. SHE STATES
DURING AND AFTER THE CAR CAME TO A COMPLETE STOP, SHE KEPT HER
FOOT ON THE BREAK THE ENTIRE TIME AND WHILE DECOMPRESSING THE
BRAKE, THE CAR THEN JOLTED FORWARD CRASHING INTO THE CAR IN
FRONT OF HER. I HAD THE CAR TOWED IN TO THE NISSAN DEALERSHIP AND
HAD CORPORATE NISSAN STEP IN TO INVESTIGATE THE CAR. 6 WEEKS
LATER THEY INVESTIGATED THE CAR REPORTING THAT NO ERROR WAS
FOUND WITH THE CAR AND AGAIN I SHOULD PICK MY VEHICLE UP. I
REQUESTED SPECIFIC TESTS AND ASKED THE TESTING PROCESS FOR THE
CAR AND WAS ADVISED BY THE INVESTIGATION DEPARTMENT THAT THEY
COULD NOT DISCLOSE THAT INFORMATION AND THAT THE TESTING AND
RESULTS WERE "PROPERTY OF NISSAN" AND THAT THEY WERE NOT
OFFERING ANY FURTHER ASSISTANCE.

- **Sep 30, 2018 - Carnegie, PA - Forward Collision Avoidance**
  AUTO EMERGENCY BRAKING IS ACTIVATING WHEN THERE IS NO VEHICLE
  OR OBSTACLE IN FRONT OF ME. IT HAPPENEND THE FIRST TIME I LEFT THE
  DEALER ON AN OPEN HIGHWAY. IT HAPPENED AGAIN IN A DARK PARKING
  GARAGE, AND AGAIN WHEN I WAS GOING LESS THAN 10 MILES AN HOUR
  OVER RAILROAD TRACKS. IT HAPPENED TO MY HUSBAND GOING OVER A
  BRIDGE WITH METAL EXPANSION JOINTS. GOOD THING NO ONE WAS
  BEHIND US WHEN IT HAPPENED. I WILL BE CALLING THE DEALER IN THE
  MORNING. MY ROGUE HAS AROUND 3,000 MILES ON IT.

  80.    Complaints concerning the 2018 Nissan Rogue are similar:

- **Sep 24, 2018 - Medford, NY - Dynamic Brake Support/Brake Assist**
  TL* THE CONTACT OWNS A 2018 NISSAN ROGUE. THE CONTACT STATED
  THAT THE VEHICLE'S AUTOMATIC BRAKING FEATURE INDEPENDENTLY
  ACTIVATED WHILE THE VEHICLE WAS BEING DRIVEN AT VARIOUS SPEEDS.
  THERE WERE NO OBSTACLES IN THE VEHICLE'S PATH. THE FAILURE
  OCCURRED WITHOUT WARNING ON APPROXIMATELY SIX OCCASIONS. THE
  DEALER AND MANUFACTURER WERE NOT NOTIFIED OF THE FAILURE. THE
  VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE FAILURE MILEAGE WAS
  APPROXIMATELY 1,600.

- **Sep 17, 2018 - Lubbock, TX - Forward Collision Avoidance**
  MY 2018 NISSAN ROGUE BRAKED SUDDENLY, FOR NO REASON. TRAVELING
  30 MPH ON A QUIET NEIGHBORHOOD STREET. THE LIGHTS ON THE
  DASHBOARD FLASHED BRIEFLY, THERE WAS A LOUD GRINDING NOISE,
  THEN SUDDEN AND COMPLETE STOP IN THE MIDDLE OF THE ROAD. NO
  CARS IN FRONT OR BACK OF MINE. THE ONLY THING IN THE ROAD WAS A
  METAL DRAIN COVER. VERY FRIGHTENING EXPERIENCE.

- **Jul 24, 2018 - The Villages, FL - Forward Collision Avoidance**
  WE PURCHASED 2018 NISSAN ROGUE IN JUNE. TODAY WE DROVE 75 MILES
  AND THE EMERGENCY BRAKING ACTIVATED 4 TIMES FOR NO REASON.
  ONCE ON THE INTERSTATE, ONCE ON THE OFF RAMP, AND TWICE ON THE
  HIGHWAY. THERE WERE NO RR TRACKS OR OTHER OBSTACLES. THIS HAS
  HAPPEN TO ME ON TWO OTHER OCCASIONS. THE VEHICLE HAS ALMOST
  1000 MILES ON IT. I+M AFRAID SOMEONE WILL THINK I+M BRAKE CHECKING
  THEM! ILL BE SPEAKING TO THE DEALER, BUT I SAW OTHER COMPLAINTS
  HERE AND DECIDED TO REGISTER MINE ALSO. WHEN THIS HAPPENS IT
  SOUNDS AS IF YOU+RE DRIVING OVER +RUMBLE STRIPS+.

- **Jul 12, 2018 - Pittsburgh, PA - Forward Collision Avoidance**
  TWO WEEK OLD NISSAN ROGUE. THE EMERGENCY BRAKING SYSTEM
  ACTIVATES IN THE PARKING GARAGE WHERE I WORK. IT SEEMS TO HAPPEN
  ANYWHERE IN THE GARAGE (ANY FLOOR) AND WHEN I SURPASS ~15MPH.
  SPOKE WITH THE DEALER AND THEY ARE GOING TO TAKE A LOOK AT IT,
  BUT GOING BY THE NUMBER OF SIMILAR COMPLAINTS ON THIS SITE I'M
  BEGINNING TO THINK NISSAN NEEDS TO ISSUE A FIX AND RECALL.

81.    Complaints concerning the 2017 Nissan Maxima are similar:

- **Jul 11, 2018 - Magnolia, NJ - Forward Collision Avoidance**
  THE PROBLEM BEGAN IN MY 2017 NISSAN MAXIMA. I TOLD THE
  DEALERSHIP THAT THE EMERGENCY AUTOMATIC BRAKING SYSTEM
  INITIATED WHILE NO OTHER CARS WERE AROUND. THEY TRADED ME IN TO
  THE 2018 NISSAN ROGUE AND THE SAME ISSUE HAS OCCURRED 3 TIMES IN
  THIS VEHICLE. EACH TIME, THERE WERE NO OTHER VEHICLES AROUND.
  THE DEALERSHIP CLAIMED THERE IS NOTHING WRONG WITH THE VEHICLE.
  IT WASN'T UNTIL I CONTACTED CORPORATE THAT THEY ADMITTED THEY
  KNOW THERE'S A DEFECT, BUT NO FIX WAS AVAILABLE YET. THEY
  KNOWINGLY JEOPARDIZED MY INFANT SON'S SAFETY AND LIED TO ME.
  THIS DEFECT IS SCARY AND SHOULDN'T BE ALLOWED TO BE SWEPT UNDER
  THE RUG BY THE DEALERSHIPS. I NO LONGER FEEL SAFE DRIVING WITH
  NISSAN.

- **Jun 23, 2018 – Fort Lauderdale, FL - Forward Collision Avoidance**
  APPLIED BRAKES IN EMERGENCY SITUATION. ABS SYSTEM FAILED TO
  OPERATE AND ALL FOUR WHEELS LOCKED AND CAR SLID INTO OTHER
  VEHICLE. ALSO CAR EQUIPPED WITH BRAKE ASSIST IT TO FAILED TO
  OPERATE.

82.    Consumers have logged similar complaints regarding the 2016 Nissan Altima:

- **October 1, 2016 – Dallas, TX – Forward Collision Avoidance**
  TL* THE CONTACT OWNS A 2016 NISSAN ALTIMA. WHILE DRIVING VARIOUS
  SPEEDS, THE FORWARD EMERGENCY BRAKING WARNING INDICATOR
  ILLUMINATED AND CAUSED THE VEHICLE TO SLOW DOWN AND THEN STOP.
  THE CONTACT TOOK THE VEHICLE TO A DEALER, BUT THERE WAS NO
  RESOLUTION FOR THE ISSUE WITH THE EMERGENCY BRAKE. THE

MANUFACTURER WAS NOTIFIED OF THE ISSUE. THE FAILURE MILEAGE WAS 7,259.

83.     Consumers have logged similar complaints regarding the 2017 Nissan Altima:

- **March 13, 2017 – Manchester, TN – Forward Collision Avoidance**
EMERGENCY FORWARD BRAKING DOES NOT DO ANYTHING THAT THE NISSAN BOOK OUTLINES OR THE ON LINE VIDEO OUTLINES. I HAVE TWO CASE NUMBERS 25746321 AND25772524 AND TWO DEALERSHIPS THE WORK REPORT SAYS NO CODE NO PROBLEM.

84.     Consumers have logged similar complaints regarding the 2018 Nissan Altima:

- **November 30, 2018 – Louisville, KY – Electrical System**
I PURCHASED A NEW 2018 NISSAN, THE FRONT END COLLISION SENSOR IS ALARMING AND HAS EVER SINCE THE CAR WAS NEW. I HAVE TAKEN IT TO TWO DIFFERENT DEALERS AND THEY HAVE REFERRED ME TO NISSAN AND SAY THAT I SHOULD WAIT FOR THE RECALL. I THINK THIS IS UNACCEPTABLE AS MY CAR IS NOT SAFE WITH THE FRONT END COLLISION NOT WORKING PROPERLY. PLEASE HELP ME FIX THIS PROBLEM. AS I AM DRIVING DOWN THE ROAD, THE SENSOR ALARMS AND SAYS IT IS NOT WORKING WHEN THERE IS NOTHING IN FRONT OF MY VEHICLE. I HAD ONE DEALER TELL ME IT WAS PICKING UP THE SUN......PLEASE HELP.

85.     Consumers have logged similar complaints regarding the Nissan Leaf:

- **Jun 25, 2018 - Phoenix, AZ - Forward Collision Avoidance**
WHILE DRIVING FORWARD, THE VEHICLE SUDDENLY, UNEXPECTEDLY AND VIOLENTLY APPLIES THE BRAKES WITHOUT ANY DRIVER INPUT WHATSOEVER! THERE ARE NO OTHER VEHICLES OR PEDESTRIANS IN THE VICINITY AT THE TIME. THIS SUDDEN BRAKING PROBLEM BEGAN ON OR ABOUT 5/15/18 AND HAPPENED ON SEVERAL OCCASIONS AFTER THAT. TWICE WHILE ENTERING THE UNDERGROUND PARKING GARAGE AT AN OFFICE BUILDING AND TWICE WHILE DRIVING ON A CITY STREET. VEHICLE HAS BEEN AT THE LOCAL NISSAN DEALER FOR OVER A WEEK BUT NEITHER THE DEALERSHIP NOR THE MANUFACTURER APPARENTLY HAS ANY IDEA HOW TO FIX THE PROBLEM. THEY THINK THAT THERE IS A FAULT IN THE AUTOMATIC EMERGENCY BRAKING SYSTEM. THE SERVICE MANAGER TOLD ME THAT OTHER INSTANCES OF THE SAME ISSUE HAVE BEEN REPORTED TO NISSAN. THE SALESPERSON INDICATED THAT THERE WERE 4 OTHER SIMILAR CASES AT THEIR DEALERSHIP ALONE.THEY ALSO WILL NOT LET US TAKE THE VEHICLE HOME WITHOUT SIGNING A RELEASE OF LIABILITY DOCUMENT. THE OBVIOUS CONCERN IS THAT THE EMERGENCY BRAKING SYSTEM WILL AGAIN RANDOMLY ACTIVATE WHILE TRAVELING AT A HIGHER SPEED AND CAUSE AN ACCIDENT RESULTING IN SERIOUS PROPERTY DAMAGE AND INJURIES!

86.     Consumers have logged similar complaints regarding the 2018 Nissan Sentra:

- **Jul 31, 2018 - Cedar Park, TX - Forward Collision Avoidance**
THE FRONT SENSOR KEEP SHOWING THE "FRONT SENSOR UNAVAILABLE" FOLLOWED BY THE CRASH ICON AT ALL TIMES OF THE DAY, AND ALL

SPEEDS INCLUDING IN THE STOPPED POSITION. THE SENSOR GOES OUT REGARDLESS OF WHETHER OR NOT THERE ARE OTHER VEHICLES NEAR THE CAR.

87.    Consumers have logged similar complaints regarding the 2017 Nissan Pathfinder:

- **September 21, 2018 – Sarasota, FL – Forward Collision Avoidance**
  MY EMERGENCY BRAKING KEEPS SENDING ME ALERTS WHEN THERE IS NOTHING IN FRONT OF ME. I'M GETTING MESSAGES THAT THE SYSTEM IS DISABLE BECAUSE OF AN OBSTRUCTION. THIS HAPPENS A LOT OF TIMES WHEN IT'S RAINING OUT. I HAVE OPEN A COMPLAINT WITH NISSAN CASE NUMBER 32896677. THE DEALER TELLS ME RAIN CAN EFFECT THE SYSTEM. WHEN THE WEATHER IS BAD IS WHEN YOU NEED THE SYSTEM THE MOST.

88.    Consumers have logged similar complaints regarding the 2018 Nissan Pathfinder:

- **July 25, 2018 – Fort Meade, FL – Vehicle Speed Control**
  THE INTELLIGENT CRUSE CONTROL SYSTEM WORK INTERMINTENTLY. WHEN THIS HAPPENS THE SAFETY BRAKING SYSTEM DOES NOT WORK.

89.    The above complaints represent only a sampling of otherwise voluminous complaints regarding the FEB Defect that members of the Classes have reported to Nissan directly and through its dealers.

90.    Nissan also made partial representations while suppressing a material fact. Specifically, the owner's manuals of many of the Class Vehicles said, "[t]he FEB system can assist the driver when there is a risk of a forward collision with the vehicle ahead in the traveling lane," and that "[t]he FEB system uses a radar sensor … located behind the front bumper to measure the distance to the vehicle ahead in the same lane."  Although the manual discloses that the "FEB system does not function in all driving, traffic, weather and road conditions," the manual does not disclose that the FEB system has a defect that can cause sudden deceleration or stops even if there is not another vehicle ahead in the traffic lane.  Nor does the manual disclose that the defect can cause the FEB system to deactivate regardless of "driving, traffic, weather and road conditions."  The owner's manuals of other Class Vehicles said the same thing, except that it used the term "AEB system" instead of the "FEB system."

91.    Although Nissan was aware of the widespread nature of the FEB Defect in the Class Vehicles, and that it posed grave safety risks, Nissan has failed to take adequate steps to notify all Class Vehicle owners of the FEB Defect and provide relief.

92.     Defendants have not recalled the Class Vehicles to repair the FEB Defect, have not initiated a customer service campaign to address the FEB Defect, have not offered Plaintiffs and the other Class members a suitable repair or replacement of parts related to the FEB Defect free of charge, and have not reimbursed Plaintiffs and all other Class members who incurred costs for repairs related to the FEB Defect.

93.     Plaintiffs and the other Class members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

94.     Defendants have deprived Plaintiffs and the other Class members of the benefit of their bargain, exposed them all to a dangerous safety defect without any notice, and failed to repair or otherwise remedy the FEB Defect contained in the Class Vehicles.  As a result of the FEB Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.  Reasonable consumers, like Plaintiffs, expect and assume that a vehicle's FEB system and the related components are not defective and will not malfunction while operating the vehicle as it is intended to be operated and thus did not receive the benefit of their bargain, i.e., the price premium they paid attributable to the FEB system.

95.     Plaintiffs and the other Class members further expect and assume that Nissan will not sell or lease vehicles with known safety defects, such as the FEB Defect, and will fully disclose any such defect to consumers prior to purchase, or offer a suitable, non-defective, repair.

**C.     Nissan Received Pre-Suit Notice Multiple Times and in Multiple Ways**

96.     In addition to other forms of notice, including those detailed in this Complaint, Nissan was put on notice of Plaintiff Kerkorian's claims for the FEB Defects in his 2017 and 2018 Rogues through his dealings, in 2017 and 2018, with Crest Nissan and Nissan corporate.

97.     In addition to other forms of notice, including those detailed in this Complaint, Nissan was put on notice of Plaintiff Turner's claims when he reported the FEB Defect to his Nissan dealership in 2018.  Furthermore, Plaintiff Turner, individually and on behalf of the other Class members, notified Nissan of the FEB Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter sent by certified mail on December 17, 2018 to Nissan's

registered agent in Franklin, Tennessee.  Electronic verification confirmed Nissan received the notice letter on December 18, 2018. The notice specifically described the defect at issue, stated the notice was being sent pursuant to Mass. Gen. Laws ch. 93A § 9 and 15 U.C.C. § 2301, and stated Defendants had breached warranties and are in violation of Massachusetts Regulation of Business Practices for Consumer Protection Act.

98.    Plaintiffs Robert Garneau, Nancy Housell, and Jeff Olkowski sent Defendants a letter providing pre-suit notice and demand for corrective action concerning the defect at issue in this complaint.  The notice specifically described the defect at issue, stated the notice was being sent pursuant to California Civil Code § 1782 and U.C.C. § 2-607(3)(A), and stated Defendants had breached warranties and violated California, New York and Pennsylvania consumer statutes. The notice letter further stated that it was being sent on behalf of Robert Garneau, Nancy Housell, Jeff Olkowski, and a putative nationwide class and California subclass, New York subclass, and Pennsylvania subclass.

## CLASS ALLEGATIONS

99.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Classes:

>   All persons or entities in the United States that purchased, lease, leased, own or owned a 2015-present Nissan or Infiniti vehicle equipped with Automatic Emergency Braking or Forward Emergency Braking (the "Nationwide Class");

>   All persons or entities in California that purchased, lease, leased, own or owned a 2015-present Nissan or Infiniti vehicle equipped with Automatic Emergency Braking or Forward Emergency Braking (the "California Class");

>   All persons or entities in Florida that purchased, lease, leased, own or owned a 2015-present Nissan or Infiniti vehicle equipped with Automatic Emergency Braking or Forward Emergency Braking (the "Florida Class");

>   All persons or entities in Massachusetts that purchased, lease, leased, own or owned a 2015-present Nissan or Infiniti vehicle equipped with Automatic Emergency Braking or Forward Emergency Braking (the "Massachusetts Class");

All persons or entities in Missouri that purchased, lease, leased, own or owned a 2015-present Nissan or Infiniti vehicle equipped with Automatic Emergency Braking or Forward Emergency Braking (the "Missouri Class");

All persons or entities in New York that purchased, lease, leased, own or owned a 2015-present Nissan or Infiniti vehicle equipped with Automatic Emergency Braking or Forward Emergency Braking (the "New York Class");

All persons or entities in Pennsylvania that purchased, lease, leased, own or owned a 2015-present Nissan or Infiniti vehicle equipped with Automatic Emergency Braking or Forward Emergency Braking (the "Pennsylvania Class");

All persons or entities in Texas that purchased, lease, leased, own or owned a 2015-present Nissan or Infiniti vehicle equipped with Automatic Emergency Braking or Forward Emergency Braking (the "Texas Class").

100.    Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment or amended complaint, or narrowed at class certification.

101.    Specifically excluded from the Classes are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

102.    **Numerosity.**  The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of individuals that are members of the proposed Classes.  Although the precise number of proposed members are unknown to Plaintiffs, the true number of members of each of the Classes is known by Defendants.  More specifically, Nissan and its network of authorized dealers maintains

databases that contain the following information: (i) the name of each Class member that leased or purchased a vehicle; and (ii) the address of each Class member.  Thus, members of the proposed Classes may be identified and notified of the pendency of this action by first class mail, electronic mail, and/or published notice, as is customarily done in consumer class actions.

103.     **Typicality.**  The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all other members of the Classes, paid for Class Vehicles designed, manufactured, and distributed by Defendants which is afflicted by the FEB Defect.  The representative Plaintiffs, like all other members of the Classes, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing this malfunctioning FEB system and related parts as a result of the FEB Defect.  Further, the factual bases of Defendants' misconduct are common to all members of the Classes and represent a common thread of fraudulent, deliberate, and/or grossly negligent misconduct resulting in injury to all members of the Classes.

104.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

(a)     Whether the Class Vehicles suffer from the FEB Defect;

(b)     Whether the Class Vehicles contain a design defect and/or a defect in material, manufacturing and/or workmanship;

(c)     Whether the FEB Defect constitutes an unreasonable safety hazard;

(d)     Whether Defendants knew or should have known about the FEB Defect and, if so, how long Defendants have known of the FEB Defect;

(e)     Whether Defendants had a duty to disclose that the Class Vehicles suffer from the FEB Defect;

(f)     Whether Defendants breached their duty to disclose that the Class Vehicles suffer from the FEB Defect;

(g)     Whether Defendants intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the fact that the Class Vehicles suffered from the FEB Defect;

(h)     Whether Defendants negligently and falsely misrepresented or omitted material facts including the fact that the Class Vehicles suffered from the FEB Defect;

(i)     Whether Defendants made material misrepresentations and/or omissions concerning the standard, quality or grade of the Class Vehicles and the FEB Defect;

(j)     Whether members of the Classes would have paid less for the Class Vehicles if Defendants, at the time of purchase or lease, disclosed that the vehicles suffered from the FEB Defect;

(k)     Whether Defendants are liable to Plaintiffs and the Classes for breaching their express and/or implied warranties;

(l)     Whether Defendants are liable to Plaintiffs and the Classes for violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* and/or any other statutory duties under state laws;

(m)     Whether Defendants violated applicable state consumer protection statutes;

(n)     Whether Defendants have been unjustly enriched; and

(o)     Whether Plaintiffs and the Classes are entitled to damages, restitution, equitable, injunctive, compulsory, or other relief.

105.     **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs have retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Classes.

106.     **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by members of the Classes is relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of

1    inconsistent or contradictory judgments arising from the same set of facts. Individualized

2    litigation would also increase the delay and expense to all parties and the court system from the

3    issues raised by this action.  By contrast, the class action device provides the benefits of

4    adjudication of these issues in a single proceeding, economies of scale, and comprehensive

5    supervision by a single court, and presents no unusual management difficulties under the

6    circumstances.

7        107.    In the alternative, the Classes may also be certified because:

8            (a)    the prosecution of separate actions by individual members of the
9            Classes would create a risk of inconsistent or varying adjudication with
             respect to individual Class members that would establish incompatible
10           standards of conduct for the Defendants;

11           (b)    the prosecution of separate actions by individual Class members
12           would create a risk of adjudications with respect to them that would, as a
             practical matter, be dispositive of the interests of other members of the
13           Classes not parties to the adjudications, or substantially impair or impede
             their ability to protect their interests; and/or
14
             (c)    Defendants have acted or refused to act on grounds generally
15           applicable to the Classes as a whole, thereby making appropriate final
             declaratory and/or injunctive relief with respect to the members of the
16           Classes as a whole.

17                            **CLAIMS FOR RELIEF**

18                                **COUNT I**
19                            **Fraudulent Omission**

20       108.    Plaintiffs incorporate and reallege each of the preceding paragraphs as though fully

21   set forth herein.

22       109.    Plaintiffs bring this count on behalf of themselves and the other Class members.

23       110.    Defendants intentionally and knowingly falsely concealed, suppressed, and/or

24   omitted material facts including the standard, quality or grade of the Class Vehicles and the fact

25   that the FEB system in the Class Vehicles is defective, exposing drivers, occupants and members

26   of the public to safety risks with the intent that Plaintiffs and the other members of the Classes

27

28

rely on Defendants' omissions.  As a direct result of Defendants' fraudulent conduct, Plaintiffs and the other members of the Classes have suffered actual damages.

111.    As a result of Defendants' failure to disclose to Plaintiffs and the other members of the Classes the material fact that the FEB system in the Class Vehicles is defective, owners and lessors of the Class Vehicles are required to spend thousands of dollars to repair or replace the FEB Defect or sell their vehicles at a substantial loss.  The fact that the FEB system in the Class Vehicles is defective is material because no reasonable consumer expects that she or she will have to spend thousands of dollars for diagnosis, repair or replacement of the FEB Defect, and because Plaintiffs and the other members of the Classes had a reasonable expectation that the vehicles would not suffer from the FEB Defect.

112.    The fact that the FEB system installed in the Class Vehicles is defective is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death.  Because of the FEB Defect, the Class Vehicles may suddenly brake automatically while driving in traffic.  Drivers and occupants of the Class Vehicles are at risk for rear-end collisions and other accidents caused by the FEB Defect, and the general public is also at risk for being involved in an accident with a Class Vehicle.  Plaintiffs and the other members of the Classes would not have purchased the Class Vehicles but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the FEB Defect, or would have paid less for the Class Vehicles.

113.    Defendants knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Defendants knew their concealment and suppression of the FEB Defect would sell more Class Vehicles.

114.    Despite notice of the FEB Defect from, among other things, pre-production testing, numerous consumer complaints, warranty data, and dealership repair orders, Defendants have not recalled the Class Vehicles to repair the Defect, have not offered its customers a suitable repair or replacement free of charge, and have not offered to reimburse all Class members the costs they

incurred relating to diagnosing and repairing the FEB Defect or for the premium price that they paid for the FEB feature.

115.    At minimum, Defendants knew about the FEB Defect by way of customer complaints filed with affiliated dealerships and through the NHTSA, as extensively documented above.  As such, Defendants acted with malice, oppression and fraud.  Plaintiffs and the other members of the Classes reasonably relied upon Defendants' knowing, affirmative and active false representations, concealment and omissions.  As a direct and proximate result of Defendants' false representations, omissions and active concealment of material facts regarding the FEB Defect, Plaintiffs and the other members of the Classes have suffered actual damages in an amount to be determined at trial.

## COUNT II
### Breach Of Express Warranty

116.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

117.    Plaintiffs bring this count on behalf of themselves and the other Class members.

118.    Defendants marketed the Class Vehicles as safe, built to last, and reliable vehicles. Such representations formed the basis of the bargain in Plaintiffs' and the other Class members' decisions to purchase or lease the Class Vehicles.

119.    Defendants are and were at all relevant times merchants and sellers of motor vehicles as defined under the Uniform Commercial Code.

120.    With respect to leases, Defendants are and were at all relevant times lessors of motor vehicles as defined under the Uniform Commercial Code.

121.    The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

122.    In connection with the purchase or lease of each of the Class Vehicles, Defendants provide warranty coverage for the Class Vehicles under one or more manufacturer's warranties. For illustrative purposes, NNA offers a 36-month or 36,000-mile Basic Warranty that "covers any

repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan." Under warranties provided to Plaintiffs and the other members of the Classes, Defendants promised to repair or replace defective FEB components arising out of defects in materials and/or workmanship, such as the FEB Defect, at no cost to owners or lessors of the Class Vehicles.

123. Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and the other members of the Classes purchased or leased their Class Vehicles.

124. Despite the existence of the warranties, Defendants failed to inform Plaintiffs and the other members of the Classes that the Class Vehicles contained the FEB Defect, and, thus, wrongfully transferred the costs of repair or replacement of the FEB Defect to Plaintiffs and the other members of the Classes.

125. Defendants have failed to provide Plaintiffs or the other members of the Classes with a meaningful remedy for the FEB Defect, in clear breach of the express warranty described above, promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts they supplied.

126. As described at length above, Defendants were on notice of the FEB Defect, and as such have been afforded a reasonable opportunity to cure their breach of written warranties. Any additional time to do so would be unnecessary and futile because Defendants have known of and concealed the FEB Defect and, on information and belief, have refused to repair or replace the FEB Defect free of charge despite the FEB Defect's existence at the time of sale or lease of the Class Vehicles.

127. As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and the other members of the Classes have been damaged in an amount to be determined at trial.

128. Finally, because of Defendants' breach of express warranty as set forth herein, Plaintiffs and the other members of the Classes assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other members of

the Classes of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

129.    On November 26, 2018, prior to filing this action, Defendants were served with a pre-suit notice letter that complied in all respects with U.C.C. §§ 2-313, 2-607.  Plaintiffs' counsel sent Defendants a letter advising them that they breached an express warranty and demanded that they cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

<u>COUNT III</u>
**Breach Of Implied Warranty**

130.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

131.    Plaintiffs bring this count on behalf of themselves and the other members of the Classes.

132.    Plaintiffs and the other members of the Classes purchased or leased the Class Vehicles from Defendants by and through their authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party.  At all relevant times, Defendants were the manufacturers, distributors, warrantors, and/or sellers of Class Vehicles.  Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

133.    Defendants are and were at all relevant times merchants and sellers of motor vehicles as defined under the Uniform Commercial Code.

134.    With respect to leases, Defendants are and were at all relevant times lessors of motor vehicles as defined under the Uniform Commercial Code.

135.    The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

136.    Defendants impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

137.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation.  The Class Vehicles contain the FEB Defect and present an undisclosed safety risk to drivers and occupants.  Thus, Defendants breached their implied warranty of merchantability.

138.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other members of the Classes have been damaged in an amount to be proven at trial.

**COUNT IV**
**Violation Of The Magnuson-Moss Warranty Act ("MMWA")**

139.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

140.    Plaintiffs bring this count on behalf of themselves and the other members of the Nationwide Class.

141.    Plaintiffs satisfy the MMWA jurisdictional requirement because they allege diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

142.    Plaintiffs and the other members of the Nationwide Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

143.    Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

144.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

145.    The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.  *See* 15 U.S.C. § 2310(d)(1).

146.    Defendants provided Plaintiffs and the other members of the Nationwide Class with one or more express warranties, which are covered under 15 U.S.C. § 2301(6).  For illustrative purposes, NNA offers a 36-month or 36,000-mile Basic Warranty that "covers any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan."

147.    Under warranties provided to Plaintiffs and the other members of the Nationwide Class, Defendants promised to repair or replace defective FEB components arising out of defects in materials and/or workmanship, such as the FEB Defect, at no cost to owners or lessors of the Class Vehicles. However, Defendants have failed to provide owners with a remedy to the FEB Defect.

148.    The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

149.    Defendants breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the FEB Defect.  Without limitation, the Class Vehicles share a common defect in design, material, manufacturing and/or workmanship.  Through their issuance of TSBs to their authorized dealers, Defendants have acknowledged that the Class Vehicles are not of the standard, quality or grade that Defendants represented at the time of purchase or lease and contain the FEB Defect.

150.    Plaintiffs and the other members of the Nationwide Class have had sufficient direct dealings with Defendants or their agents (dealerships) to establish privity of contract between Defendants, on the one hand, and Plaintiffs and the other members of the Nationwide Class, on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each other member of the Nationwide Class are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of their implied warranties.  The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessors of the Class Vehicles only.

151.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile.  At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Defendants knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the FEB Defect, but failed to remediate the same.  Likewise, Defendants failed to disclose the FEB Defect.  Under the circumstances, the remedies available under any informal settlement

procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

152.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

153.     Plaintiffs, individually and on behalf of the other members of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT V
### Unjust Enrichment

154.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

155.     Plaintiffs bring this count on behalf of themselves and the other members of the Classes.

156.     The unjust enrichment claim of Plaintiff Kerkorian and the other Texas Class members is alternatively denominated a claim for "money had and received."  Under Texas law, it is the same thing as a claim for unjust enrichment

157.     Plaintiffs and the other members of the Classes conferred a benefit on Defendants by leasing or purchasing the Class Vehicles.  Defendants were and should have been reasonably expected to provide Class Vehicles free from the FEB Defect.

158.     Defendants unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions and concealment of the FEB Defect in the Class Vehicles.

159.     As a proximate result of Defendants' false representations, omissions and concealment of the FEB Defect in the Class Vehicles, and as a result of Defendants' ill-gotten gains, benefits and profits, Defendants have been unjustly enriched at the expense of Plaintiffs

and the other members of the Classes. It would be inequitable for Defendants to retain their ill-gotten profits without paying the value thereof to Plaintiffs and the other members of the Classes.

160.    There is a direct relationship between Defendants on the one hand, and Plaintiffs and the other class members on the other, sufficient to support a claim for unjust enrichment. Defendants, acting in concert, failed to disclose the FEB Defect to improve retail sales, which in turn improved wholesale sales.   Conversely, Defendants knew that disclosure of the FEB Defect would suppress retail and wholesale sales of the Class Vehicles, suppress leasing of the Class Vehicles, and would negatively impact the reputation of Defendants' brand among Plaintiffs and the other Class members.  Defendants also knew their concealment and suppression of the FEB Defect would discourage Plaintiffs and the other Class members from seeking replacement or repair concerning the FEB Defect, thereby increasing profits and/or avoiding the cost of such replacement or repairs.

161.    Plaintiffs and the other members of the Classes are entitled to restitution of the amount of Defendants' ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

162.    Plaintiffs and the other members of the Classes seek an order requiring Defendants' to disgorge their gains and profits to Plaintiffs and the other members of the Classes, together with interest, in a manner to be determined by the Court.

## COUNT VI
### Violation Of California's Consumer Legal Remedies Act, California Civil Code § 1750 *et seq.* ("CLRA") (Injunctive Relief Only)

163.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

164.    Plaintiffs bring this claim on behalf of themselves and the other members of the Nationwide Class and California Class against Defendants.

165.    NNA is a "person" as defined by California Civil Code § 1761(c).  NMC is a "person" as defined by California Civil Code § 1761(c).

166.    Plaintiffs and the other Nationwide Class and California Class Members are "consumers" within the meaning of California Civil Code § 1761(d).

167.    By failing to disclose and concealing the defective nature of the Class Vehicles' FEBs from Plaintiffs and the other members of the Nationwide Class and California Class, Defendants violated California Civil Code § 1770(a), as they represented that the Class Vehicles had characteristics and benefits that they do not have, represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another, and advertised the Class Vehicles with the intent not to sell them as advertised. *See* Cal. Civ. Code §§ 1770(a)(5), (7) & (9).

168.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

169.    Defendants knew that the Class Vehicles' FEB systems suffered from an inherent defect, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

170.    Defendants were under a duty to Plaintiffs and the other members of the Nationwide Class and California Class to disclose the defective nature of the Class Vehicles' FEB systems and/or the associated repair costs because: a) Defendants were in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles' FEBs; b) Plaintiffs and the other members of the Nationwide Class and California Class could not reasonably have been expected to learn or discover that their FEBs have a dangerous safety defect until after they purchased the Class Vehicles; and c) Defendants knew that Plaintiffs and the other members of the Nationwide Class and California Class could not reasonably have been expected to learn about or discover the FEB Defect.

171.    By failing to disclose the FEB Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

172.     The facts concealed or not disclosed by Defendants to Plaintiffs and the other members of the Nationwide Class and California Class are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.  Had Plaintiffs and the other members of the Nationwide Class and California Class known that the Class Vehicles' FEBs were defective, they would not have purchased the Class Vehicles or would have paid less for them.

173.     Plaintiffs and the other members of the Nationwide Class and California Class are reasonable consumers who do not expect that their vehicles will suffer from a FEB Defect.  That is the reasonable and objective consumer expectation for vehicles and their FEB systems.

174.     As a result of Defendants' misconduct, Plaintiffs and the other members of the Nationwide Class and California Class have been harmed and have suffered actual damages in that the Class Vehicles and their FEB systems are defective and require repairs or replacement.

175.     As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiffs and the other members of the Nationwide Class and California Class have suffered and will continue to suffer actual damages.

176.     At this time, Plaintiffs Garneau, Housell, and Olkowski seeks injunctive relief only for this violation of the CLRA.  They reserve their right to seek all available damages under the CLRA for all violations complained of herein, including, but not limited to, statutory damages, punitive damages, attorneys' fees and cost and any other relief that the Court deems proper.

177.     Accordingly, Plaintiffs and the other members of the Nationwide Class and California Class seek an order enjoining the acts and practices described above.

## COUNT VII
### Violation of California's Unfair Competition Law ("UCL")

178.     Plaintiffs hereby incorporate by reference and reallege the allegations contained in the preceding paragraphs of this Complaint.

179.     Plaintiffs bring this cause of action on behalf of themselves and the other members of the Nationwide Class and California Class against Defendants.

180.     California Business & Professions Code Section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

181.     Defendants knew that the Class Vehicles' FEB systems suffered from an inherent defect, were defectively designed and/or manufactured, would fail prematurely, and were not suitable for their intended use.

182.     In failing to disclose the FEB Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so, thereby engaging in a fraudulent business act or practice within the meaning of the UCL.

183.     Defendants were under a duty to Plaintiffs and the other members of the Nationwide Class and California Class to disclose the defective nature of the Class Vehicles' FEB systems because: a) Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' FEB systems; b) Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles' FEB systems; and c) Defendants actively concealed the defective nature of the Class Vehicles' FEB systems from Plaintiffs and the other Class Members at the time of sale and thereafter.

184.     The facts concealed or not disclosed by Defendants to Plaintiffs and the other members of the Nationwide Class and California Class are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them.  Had Plaintiffs and the other members of the Nationwide Class and California Class known that the Class Vehicles suffered from the FEB Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

185.     Defendants continued to conceal the defective nature of the Class Vehicles and their FEB systems even after Plaintiffs and the other members of the Nationwide Class and California

Class began to report problems.  Indeed, Defendants continue to cover up and conceal the true nature of this systematic problem today.

186.    Defendants' omissions of material facts, as set forth herein, also constitute "unfair" business acts and practices within the meaning of the UCL, in that Defendants' conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous.  Plaintiffs also assert a violation of public policy arising from Defendants' withholding of material safety facts from consumers.  Defendants' violation of consumer protection and unfair competition laws resulted in harm to consumers.

187.    Defendants' omissions of material facts, as set forth herein, also constitute unlawful business acts or practices because they violate consumer protection laws, warranty laws and the common law as set forth herein.

188.    Thus, by their conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

189.    Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, and were capable of deceiving a substantial portion of the purchasing public.

190.    As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and the other members of the Nationwide Class and California Class have suffered and will continue to suffer actual damages.

191.    Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and the other members of the Nationwide Class and California Class pursuant to sections 17203 and 17204 of the Business & Professions Code.

## <u>COUNT XIII</u>
**Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 502.201, *et seq.***

192.    Plaintiffs Courtney Johnson and Rhonda Perry hereby incorporate by reference and realleges the allegations contained in the preceding paragraphs of this Complaint.

193.    Plaintiffs Johnson and Perry bring this claim individually and on behalf of the other members of the Florida Class against Defendants.

194.   The Florida Deceptive and Unfair Trade Practices Act, F.S.A. §§ 501.201, *et seq.*, states that, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

195.   By the conduct described in detail above and incorporated herein, Nissan engaged in unfair or deceptive acts in violation of F.S.A. § 501.204.

196.   Nissan's omissions regarding the FEB Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

197.   Nissan intended for Plaintiffs Johnson and Perry and the other Florida Class members to rely on Nissan's omissions regarding the FEB Defect.

198.   Plaintiffs Johnson and Perry, and the other Florida Class members, justifiably acted or relied to their detriment upon Nissan's omissions of fact concerning the above-described FEB Defect, as evidenced by Plaintiff and the other Florida Class members' purchases of Class Vehicles.

199.   Had Nissan disclosed all material information regarding the FEB Defect to Plaintiff and the other Florida Class members, Plaintiffs Johnson and Perry and the other Florida Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

200.   Nissan's omissions have deceived Plaintiffs Johnson and Perry, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Florida Class.

201.   In addition to being deceptive, the business practices of Nissan were unfair because Nissan knowingly sold Plaintiffs Johnson and Perry and the other Florida Class members Class Vehicles with defective FEB systems that are essentially unusable for the purposes for which they were sold.  The injuries to Plaintiffs Johnson and Perry and the other Florida Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs Johnson and Perry and the other Florida Class members or to competition under all of the circumstances.  Moreover, in light of Nissan's exclusive knowledge of the FEB Defect, the injury is not one that Plaintiffs Johnson and Perry or the other Florida Class members could have reasonably avoided.

202.    As a direct and proximate result of Nissan's unfair and deceptive trade practices, Plaintiffs Johnson and Perry and the other Florida Class members have suffered ascertainable loss and actual damages.  Plaintiffs Johnson and Perry and the other Florida Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the FEB Defect been disclosed. Plaintiffs Johnson and Perry and the other Florida Class members also suffered diminished value of their vehicles.  Plaintiffs Johnson and Perry and the other Florida Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under F.S.A. §§ 501.201, *et seq.*

**COUNT IX**
**Violations Of The Massachusetts**
**Regulation Of Business Practices For Consumer Protection Act**
**Mass Gen. Laws ch. 93A, §§ 1, *et seq.***

203.    Plaintiff David Turner ("Plaintiff," for purposes of the Massachusetts Class's claims) hereby incorporates by reference and realleges the allegations contained in the preceding paragraphs of this Complaint.

204.    Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts Class (the "Class," for purposes of this Count).

205.    The Massachusetts Regulation of Business Practices for Consumer Protection Act ("Massachusetts Consumer Protection Act") prohibits "[u]nfair methods of competition and unfair or deceptive practices in the conduct of any trade or commerce. . . ."  Mass Gen. Laws ch. 93A, § 2.

206.    By the conduct described in detail above and incorporated herein, Nissan engaged in unfair or deceptive acts in violation of Mass Gen. Laws ch. 93A, § 2.

207.    Nissan's omissions regarding the FEB Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

208.    Nissan intended for Plaintiff and the other Class members to rely on Nissan's omissions regarding the FEB Defect.

209.    Plaintiff and the other Class members justifiably acted or relied to their detriment upon Nissan's omissions of fact concerning the above-described FEB Defect, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

210.    Had Nissan disclosed all material information regarding the FEB Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

211.    Nissan's omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

212.    As a direct and proximate result of Nissan's deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages.  Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the FEB Defect been disclosed.  Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under the Massachusetts Consumer Protection Act.

### COUNT X
**Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.***

213.    Plaintiffs Scott and Jane Reeves ("Plaintiffs Reeves") hereby incorporate by reference and realleges the allegations contained in the preceding paragraphs of this Complaint.

214.    Plaintiffs Reeves brings this claim individually and on behalf of the other members of the Missouri Class against Defendants.

215.     Nissan, Plaintiffs Reeves, and the other Missouri Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

216.     Nissan engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mor. Rev. Stat. § 407.010(7).

217.     The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful "the act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

218.     In the course of Nissan's business, it willfully failed to disclose and actively concealed the FEB Defect, described above. Accordingly, Nissan used or employed deception and fraud, and concealed, suppressed and omitted a material fact in connection with the sale or advertisement of merchandise in trade or commerce, in violation of the Missouri MPA. Nissan's conduct offends public policy; is unethical and unscrupulous; and presents a risk of, or causes, substantial injury to consumers.

219.     Nissan's omissions regarding the FEB Defect, described above, are material facts that a reasonable person would have considered in deciding to purchase (or pay the same price for) the Class Vehicles.

220.     Nissan intended for Plaintiffs Reeves and the other Missouri Class members to rely on Nissan's omissions of fact regarding the Sliding Door Defect.

221.     Plaintiffs Reeves and the other Missouri Class members were injured by Nissan's omissions of fact concerning the above-described FEB Defect, as evidenced by Plaintiffs Reeves and the other Missouri Class members' purchases of Class Vehicles.

222.     Had Nissan disclosed all material information regarding the FEB Defect to Plaintiffs Reeves and the other Missouri Class members, Plaintiffs Reeves and reasonable consumers would not have purchased or leased Class Vehicles or would have paid less to do so.

223.     Nissan's omissions deceived Plaintiffs Reeves, and those same business practices have deceived or are likely to deceive members of the consuming public and the other Missouri Class members.

224.     In addition to being deceptive, the business practices of Nissan were unfair because Nissan knowingly sold Plaintiffs Reeves and the other Missouri Class members Class Vehicles with defective FEB systems that are essentially unusable for the purposes for which they were sold.  The injuries to Plaintiffs Reeves and the other Missouri Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs Reeves and the other Missouri Class members or to competition under all of the circumstances.  Moreover, in light of Nissan's exclusive knowledge of the FEB Defect, the injury is not one that Plaintiffs Reeves or the other Missouri Class members could have reasonably avoided.

225.     As a direct and proximate result of Nissan's unfair and deceptive trade practices, Plaintiffs Reeves and the other Missouri Class members have suffered ascertainable loss and actual damages.  Plaintiffs Reeves and the other Missouri Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the FEB Defect been disclosed.  Plaintiffs reeves and the other Missouri Class members also suffered diminished value of their vehicles.  Plaintiffs Reeves and the other Missouri Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Mo. Rev. Stat. § 407.025.

## COUNT XI
### Deceptive Acts or Practices, New York GBL § 349

226.     Plaintiffs Hendrickson and Housell hereby incorporate by reference and reallege the allegations contained in the preceding paragraphs of this Complaint.

227.     Plaintiffs Hendrickson and Housell bring this claim individually and on behalf of the other members of the New York Class against Defendants.

228.     By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices by making misrepresentations concerning the FEB Defect.

229.    The foregoing deceptive acts and practices were directed at consumers.

230.    The foregoing deceptive acts and practices are misleading in a material way because, in the course of Defendants' business, they willfully failed to disclose and actively concealed the FEB Defect as described above.  Further, Defendants misrepresented the true nature of the Class Vehicles.  Accordingly, Defendants made untrue, deceptive or misleading representations of material facts and omitted and/or concealed material facts.

231.    Defendants engaged in deceptive acts or practices when it failed to disclose material information concerning the Class Vehicles which was known to Defendants at the time of the sale. Defendants deliberately withheld the information about the FEB defect in order to postpone or prevent its warranty obligations and to induce the consumer to enter into a transaction.

232.    The reliability of the Class Vehicles, and the FEB systems, were material to Plaintiffs Hendrickson and Housell and the other members of the New York Class.  Had Plaintiffs Hendrickson and Housell and the other members of the New York Class known that their Class Vehicles had the FEB Defect, they would not have purchased the Class Vehicles, or would have done so on materially different terms.

233.    Because Defendants' deception takes place in the context of automobile safety, that deception affects the public interest.

234.    Defendants' unlawful conduct constitutes unfair acts or practices that have the capacity to and that do deceive consumers and have a broad impact on consumers at large.

235.    Plaintiffs Hendrickson and Housell and the other members of the New York Class suffered injury caused by Defendants' failure to disclose material information.  Plaintiffs Hendrickson and Housell and the other members of the New York Class overpaid for their vehicles and did not receive the benefit of their bargain.  The defective Class Vehicles do not operate reliably and pose a grave safety threat.  The value of the Class Vehicles has diminished now that the FEB system defect has to light, and Plaintiffs Hendrickson and Housell and the other members of the New York Class own vehicles that are not safe.  Further, Plaintiffs Hendrickson

and Housell and the other members of the New York Class did not receive the benefit of their

bargain in that they paid a price premium for a safety feature that was in reality a safety hazard.

236.    On behalf of themselves and other members of the New York Class, Plaintiffs

Hendrickson and Housell seek to enjoin the unlawful acts and practices described herein, to

recover her actual damages or fifty dollars, whichever is greater, three times actual damages, and

reasonable attorneys' fees.

## COUNT XII
**Pennsylvania's Trade Practices and Consumer Protection Law, 73 P.S. 201-1, *et seq.***

237.     Plaintiff Olkowski hereby incorporates by reference and realleges the allegations

contained in the preceding paragraphs of this Complaint.

238.    Plaintiff Olkowski brings this claim individually and on behalf of the other

members of the Pennsylvania Class against Defendants.

239.    Defendants' practices, acts, policies and course of conduct, as described above,

constitute unfair conduct because they (1) offend public policy; (2) are immoral, unethical,

oppressive and unscrupulous; and (3) cause substantial injury to consumers in violation of the Pa.

UTPCPL.

240.    Defendants, either directly or through their agents, concealed, suppressed and

omitted to Plaintiff Olkowski and the other Pennsylvania Class members at the time of purchase or

lease, that the Class Vehicles suffered from the FEB Defect.  Plaintiff Olkowski and the other

Pennsylvania Class members would not have bought the vehicles, or would have paid less for

them, if Defendants had disclosed the FEB Defect.

241.    Defendants knew about the FEB Defect, but did not correct it or disclose it to

Plaintiff Olkowski or the other Pennsylvania Class members.

242.    Defendants' concealment and omissions were material.

243.    Defendants' concealment and omissions occurred in the course of conduct

involving trade or commerce.  Defendants' conduct caused Plaintiff Olkowski and the other

Pennsylvania Class members to suffer ascertainable losses of money and property in that they were

misled into expending additional sums of money at its dealerships and elsewhere in the purchase

or lease of the Class Vehicles after having been misled about the presence of the FEB Defect. Defendants did so despite having prior knowledge of the defect when they placed said vehicles into the stream of commerce. Plaintiff Olkowski also seeks a declaration that Class Vehicles are defective, and owners and lessees of the Class Vehicles must be compensated, refunded, and/or have their vehicles replaced with others that do not suffer from the FEB Defect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and the other members of the Classes as follows:

A.   For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiffs as Class representatives; and naming Plaintiffs' attorneys as Class Counsel representing the Class members;

B.   For an order finding in favor of Plaintiffs and the other Class members on all counts asserted herein;

C.   For an order awarding statutory, compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

D.   For injunctive relief enjoining the illegal acts detailed herein;

E.   For prejudgment interest on all amounts awarded;

F.   For an order of restitution and all other forms of equitable monetary relief; and

G.   For an order awarding Plaintiffs their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: March 22, 2019                          Respectfully submitted,

                                               **BURSOR & FISHER, P.A.**

                                               By: _____*/s/ L. Timothy Fisher*_____
                                                              L. Timothy Fisher

                                               L. Timothy Fisher (State Bar No. 191626)
                                               Joel D. Smith (State Bar No. 244902)
                                               Frederick J. Klorczyk III (State Bar No. 320783)
                                               1990 North California Boulevard, Suite 940

Walnut Creek, California  94596
Tel: (925) 300-4455
E-Mail:  ltfisher@bursor.com
          jsmith@bursor.com
          fklorczyk@bursor.com

W. Daniel "Dee" Miles, III (pro hac vice)
H. Clay Barnett, III (pro hac vice)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS
& MILES, P.C.**
272 Commerce Street Montgomery, Alabama  36104
Tel: (334) 269-2343
dee.miles@beasleyallen.com
clay.barnett@beasleyallen.com

Adam J. Levitt*
John E. Tangren*
Daniel R. Ferri*
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Tel: (312) 214-7900
E-Mail:  alevitt@dicellolevitt.com
          jtangren@dicellolevitt.com
          dferri@dicellolevitt.com

Benjamin L. Bailey (pro hac vice)
Jonathan D. Boggs (pro hac vice)
Michael L. Murphy (pro hac vice)
**BAILEY GLASSER LLP**
209 Capitol Street
Charleston, West Virginia  25301
Tel: (304) 345-6555
E-Mail:  bbailey@baileyglasser.com
          jboggs@baileyglasser.com
          mmurphy@baileyglasser.com

Daniel A. Schlanger (pro hac vice)
**SCHLANGER LAW GROUP LLP**
9 East 40th Street, Suite 1300
New York, New York  10016
Tel: (212) 500-6114
E-Mail:  dschlanger@consumerprotection.net

Brian K. Herrington*
**SCHLANGER LAW GROUP LLP**
602 Steed Road, Suite 100
Ridgeland, Mississippi  39157
Tel: (601) 208-0013
E-Mail:  bherrington@consumerprotection.net

*Counsel for Plaintiffs and the Proposed Class*